# EXHIBIT A

Unpublished Opinion
*People v. Grice*, A106172



Not Reported in Cal.Rptr.3d                                                                              Page 1
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

People v. **Grice**
Cal.App. 1 Dist.,2005.
Only the Westlaw citation is currently available.
California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

Court of Appeal, First District, Division 5, California.
The PEOPLE, Plaintiff and Respondent,
v.
Joseph **GRICE**, Defendant and Appellant.
No. A106172.
(San Francisco County Super. Ct. No. 189083).

Dec. 16, 2005.

John R. **Vance**, Jr., Office of the State Attorney General, San Francisco, CA, for Plaintiff and Respondent.
James Kyle Gee, Oakland, CA, First District Appellate Project, San Francisco, CA, for Defendant and Appellant.
SIMONS, J.

*1 Joseph **Grice** appeals from a judgment of conviction for aggravated mayhem in violation of Penal Code section 205. On appeal he raises four claims of error. First, he contends that there was insufficient evidence from which the jury could find that he possessed the specific intent required for aggravated mayhem. Second, he argues that the trial court had a sua sponte duty to instruct the jury on the doctrine of imperfect self-defense in relation to the charge of aggravated mayhem. Third, he asserts that his trial counsel was ineffective for failing to request the imperfect self-defense instruction on the aggravated mayhem charge. Finally, he challenges certain rulings of the trial court limiting his cross-examination of a witness for the People. We find none of his contentions meritorious and therefore affirm.

Factual and Procedural Background

By information filed April 16, 2003, the District Attorney for the City and County of San Francisco charged **Grice** with attempted murder, arson causing great bodily injury, arson of an inhabited structure, and aggravated mayhem with great bodily injury. A six-day trial was conducted on the charges in December 2003. The facts, which we set out in some detail below, were adduced in those proceedings.

On September 28, 2002, San Francisco police were called to the Stanford Hotel at 250 Kearny Street where there was a report of a man on fire. An officer found Ali Ward in a hallway on the third floor of the hotel near room 328. Ward was conscious but had suffered serious burns. In a common shower room around the corner from room 328, the officer saw a tub containing water and burnt material. The officer found no one in room 328, and the room had been damaged by fire. Ward told the officer that someone had poured gasoline on him and set him on fire. The officer summoned an ambulance, and the responding paramedic found Ward lying on his back, burned from head to toe, screaming, and conscious. The paramedic was unable to discern Ward's race because of the burned condition of his body.

Ward was taken to the hospital, where he kept repeating, "He poured gasoline on me and set me on fire." [FN1] According to the treating physician, Ward was having trouble breathing and would have died within 15 to 20 minutes had the doctor not inserted a breathing tube. Ward had suffered burns to his face, the inside of his mouth, his upper airway, chest, and abdomen. Ward had both partial-thickness and full-thickness burns, also known as second and third degree burns over 50 percent of his body.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                                          Page 2
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

>    FN1. A hospital emergency room nurse could not recall whether Ward said "they" had set him on fire or whether "he" did so.

Hasmukhala Ghandi, the manager of the Stanford Hotel, knew **Grice**, who lived in room 328. On September 28, 2002, Ghandi stated that **Grice** had come to the front desk and said that he had noted smoke and the smell of gasoline in his room. **Grice** did not tell Ghandi to call an ambulance and did not say that anyone was hurt. Ghandi went to the third floor, told the hotel owner to call 911, and then sprayed room 328 with a fire extinguisher. Ghandi heard a shout for help, went to the common shower room and said, "Come out, please." Ward emerged from the shower room and laid down in the hall.

*2 Mary Carder, an arson investigator for the San Francisco Fire Department, responded to the fire at 250 Kearney Street. Carder was qualified as an expert witness in fire investigation and in the determination of the origin of fires. She explained that she observed a burn pattern on the hallway carpet in front of room 328, another burn pattern on the floor outside the door, soot inside the door, and extinguisher residue in the hallway leading to the common shower area. Carder smelled gasoline inside room 328. She found a cigarette lighter covered in fire extinguisher residue near the bed, but she did not check to see if the lighter worked. Carder found no spent matches around the front door area, the burn area inside, or outside of the room. She found a candle inside a candle holder and an incense stick on a table in an area where the carpet had not been burned, but saw no evidence of burning, sooting, or heat discoloration.

Carder eliminated "all accidental sources of ignition" and concluded that the fire had been intentionally set. She testified that the candle was too far away to have ignited the gasoline. She testified that the burn patterns inside and outside the door were consistent with burning an ignitable liquid. The fire began in room 328, where it had burned the longest, and then spread to the hallway. The flammable liquid had been tossed, splashed, or poured from inside the room toward the outside.

Marie Casteel, a resident of the hotel, was a friend of **Grice's** and knew Ward to be a friend of **Grice's**. She was aware of no dispute between **Grice** and Ward. On the day of **Grice's** attack on Ward, **Grice** had come to Casteel's room. When Casteel asked **Grice** why he was there, he replied, "Because the police are upstairs." Then **Grice** told Casteel that " he [ (**Grice**) ] had set [Ward] on fire." **Grice** told Casteel that there had been a knock on his door and that he had answered the door and found Ward, who "acted suspicious." **Grice** told Casteel that "he threw something on [Ward] and threw a match on [Ward] and lit [Ward] on fire." **Grice** remained in Casteel's room until 5:00 a.m.

Casteel testified that on the day of the fire she had not told police about **Grice's** statement that he had set Ward on fire, but stated that she had told San Francisco Police Inspector Jeffrey Levin, from the police department's arson task force, the next day.[FN2] She testified that she had been afraid to tell anyone what **Grice** had told her because he was " out and about."

>    FN2. Levin testified that, on the night of the fire, he had gone to Casteel's room to ask if she knew of **Grice's** whereabouts. Casteel told him that she did not. Levin stated that the first time he had heard Casteel's statement about **Grice's** admission had been on the day she testified at trial, while he was driving her to court.

Ward, still hospitalized at the time of trial, testified by videotaped examination. Ward stated that he and **Grice** had been friends for several years. He visited **Grice** weekly, and **Grice** had never told him not to visit. Ward was addicted to crystal methamphetamine and had sold methamphetamine to both **Grice** and Casteel to support his habit. **Grice** owed Ward approximately $20.

On the day of the attack, Ward went to **Grice's** room to borrow a bicycle tire. He did not go to collect the money **Grice** owed him, because he knew **Grice** had no money. Ward knocked on **Grice's** door but no one answered. He returned some 30 minutes later, knocked again, and this time **Grice** opened the door. Ward did not have a gun

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                                                  Page 3
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

with him. He testified that he had no reason to fear **Grice** when he knocked. Ward stated, "I seen [**Grice**] and then I ... felt liquid splash me in the face, and I closed my eyes. And I opened my eyes and I seen a flame, and then I was on fire." **Grice** said nothing before he threw the gasoline. Ward saw a flame "[c]oming at [him], like being pointed at [him] around to [his] middle section." Ward "did not know if it was a candle or a lighter or what. It was all very quick. Before [he] knew it, [he] was on fire."

*3 Ward stated that he and **Grice** had had no argument that day. Ward testified that he did not push or force the door open, and did not step inside the room. Ward went to the bathroom, turned on the water, and then remembered nothing after that until the middle of November, when he awoke in the hospital. As a result of the fire, Ward's nose had to be reconstructed; he lost his ears; and he has major scars. He is unable to lift his hands to his face.

On September 29, 2002, the day after the fire, the hotel manager notified the police that **Grice** had returned. The police arrested **Grice** in the alley next to the hotel that afternoon. Levin interviewed **Grice**, who said that Ward came to his room frequently and that he began to dislike it and told Ward to stay away.

According to **Grice**, Ward had been hanging around the hotel, but had not approached **Grice** for "quite a while." About a week prior to the attack, Ward had brought **Grice** "a little ... crystal" to get him "started," although **Grice** had been "trying to stay drug-free mostly." **Grice** stated that after that visit, Ward had come to his room to "demand[ ] things." When asked if Ward had threatened him, **Grice** stated, "[T]o an extent yes, but mostly what they had to threaten with is the lady." **Grice** said that Ward "irritate[d]" and "belittle[d]" him.

**Grice** stated that Ward had been "messing with [him]." Ward had come to **Grice's** room the night before the fire, but **Grice** had not answered the door. On the day of the fire, Ward "kept knocking on the door." **Grice** said that he felt "threatened" and "hurt in a way behind what had happened."

When Ward knocked on his door the last time, **Grice** told Ward, "I don't have any money." When Ward knocked again, **Grice** unlocked the door and Ward "pushed in." When Ward was "almost in" Ward said, "Do you have my money?" **Grice** kept gasoline in a gas can in his room, and had put some gasoline in a small plastic container for cleaning purposes. While Ward was standing in the doorway to his room, **Grice** "just grabbed this thing," and threw "the thing" on Ward. **Grice** explained that "I was trying to ... get him to leave me alone." **Grice** had a religious candle burning nearby on a table. When Ward moved forward, the candle "caught it."

**Grice** told the police that "[Ward] came closer to [him].... That's when it went woosh." **Grice** stated, " I threw it right pass there and when it hit him, part of it fell down on the floor and went poof." "[I]t started from the floor and came up woof." "I remember the fire ran up the wall and went poof." **Grice** denied that he had thrown a lighter at Ward.

In a second recorded interview with Levin, **Grice** stated that his keys had been missing after Ward had visited on one occasion. **Grice** believed that in "some way" Ward had been "able to listen to [**Grice's**] room." **Grice** stated that he did not like Ward, but he did not hate him either.

**Grice** stated that Ward had opened the door. He claimed that Ward "can't be trusted [and] carries a gun[,] so I'm not going to get hurt[.] ... [B]ut I told him I didn't have money ... and I threw it on him to stop him." **Grice** said that there was a small candle nearby, and "when I threw [the gasoline], I light it [.] I might have dropped the cigarette[.]" He stated that "the fire came up from the floor, it caught my hand, then went woosh right over him ." **Grice** "didn't think the gas would go off." He stated that "I meant to throw it in his face and burn him to keep away from me." **Grice** continued, "[Ward] pushed [the door] in. And what else can I do? ... He is a tall, large person. I did not want to be shot. I didn't know it was going to light up."

*4 On December 18, 2003, the jury found **Grice** guilty of arson causing great bodily injury, arson of an inhabited structure, and aggravated mayhem with great bodily injury, but not guilty of attempted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                                                Page 4
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

murder and not guilty of attempted voluntary manslaughter, a lesser included offense of attempted murder. On February 11, 2004, the trial court sentenced **Grice** to life imprisonment with the possibility of parole for his conviction of aggravated mayhem. **Grice** filed a notice of appeal on March 30, 2004.

Discussion

I. *There Was Sufficient Evidence of Grice's Specific Intent to Sustain the Conviction for Aggravated Mayhem*

**Grice** contends that there was insufficient evidence to support his conviction for aggravated mayhem, in violation of Penal Code, section 205.[FN3] He contends that the evidence in this case established no more than an "indiscriminate attack" upon Ward and not a "controlled, directed, and limited" assault of the sort necessary to support a conviction for aggravated mayhem. As a consequence, **Grice** contends that his conviction for violation of section 205 should be reversed and reduced to a violation of section 203, simple mayhem.

> FN3. All further undesignated section references are to the Penal Code.
> Section 205 provides: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill. Aggravated mayhem is a felony punishable by imprisonment in the state prison for life with the possibility of parole."

A. *Standard of Review*

In appeals challenging the sufficiency of the evidence supporting a judgment of conviction, our standard of review is well established. After review of the whole record, we must determine whether the evidence is such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Park* (2003) 112 Cal.App.4th 61, 68 [reviewing sufficiency of the evidence in prosecution for aggravated mayhem].) In making this determination, "the appellate court ' must view the evidence in a light most favorable to [the People] and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577.) We apply the same standard of review in cases in which the People rely primarily on circumstantial evidence. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) We may not substitute our judgment for that of the jury, and if the circumstances reasonably justify the jury's findings, we may not reverse the judgment merely because we believe that the circumstances might also support a contrary finding. (*Id.* at p. 1139.) With this standard in mind, we review whether there was sufficient evidence to support **Grice's** conviction for aggravated mayhem.

B. *The Jury Could Infer Specific Intent From the Means Used to Commit the Crime and the Manner in Which It Was Committed*

Unlike simple mayhem, aggravated mayhem is a specific intent crime. (*People v. Park, supra,* 112 Cal.App.4th at p. 64 [aggravated mayhem "requires the specific intent to cause the maiming injury"]; *People v. Ferrell* (1990) 218 Cal.App.3d 828, 832-833 [unlike § 203, § 205 includes an intent requirement].) The specific intent to cause the maiming injury is an element of the crime. (*People v. Lee* (1990) 220 Cal.App.3d 320, 324-325.) Because the evidence of a defendant's state of mind is almost inevitably circumstantial, a jury "may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors. [Citation.]" (*Ferrell,* at p. 834.) The requisite intent may not be inferred simply from the fact that the injury inflicted constitutes mayhem; there must be other facts and circumstances

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split...   6/14/2007

Not Reported in Cal.Rptr.3d                                                                                             Page 5
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

supporting an inference of intent to maim. (*Park,* at p. 64; *Ferrell,* at p. 835.) Evidence that shows no more than an "indiscriminate attack" is insufficient to prove the specific intent necessary to support a conviction for aggravated mayhem. (*Lee,* at p. 325.)

\*5 In the case before us, at least two factors lead us to conclude that the jury could reasonably have found that **Grice** possessed the requisite specific intent to cause the maiming injury to Ward. We consider the means used by **Grice** to commit the crime. There is no dispute that **Grice** doused Ward with gasoline. It is well-known that gasoline is a volatile, inflammable, and explosive substance, and such knowledge can be imputed to **Grice**. (See *Varas v. Barco Mfg. Co.* (1962) 205 Cal.App.2d 246, 262 ["highly inflammable and volatile qualities of gasoline are matters of common knowledge"]; *Taormina Corporation v. Escobedo* (5th Cir.1958) 254 F.2d 171, 174 [knowledge of dangerous properties of gasoline is so general that it may be imputed to the parties to the case].) It requires "no special expertise" to know that deliberately throwing gasoline on a person and then igniting it " if not fatal, is highly likely to disable permanently." (*People v. Ferrell, supra,* 218 Cal.App.3d at p. 835 .) Thus, the means chosen by **Grice** is evidence upon which a jury could rely in finding the requisite specific intent. (See *People v. Park, supra,* 112 Cal.App.4th at p. 69 [attacking victim using steel knife sharpener in overhead throwing motion showed attack was not indiscriminate].)

**Grice** contends that there was no evidence that he had a plan to maim Ward and claims that his attack on Ward was more akin to a " 'blow struck in anger. ' " (Cf. *People v. Ferrell, supra,* 218 Cal.App.3d at p. 835 [intent shown by evidence that defendant had come looking for her victim by name].) But contrary to **Grice's** interpretation of the incident, the jury could well have believed Ward's testimony that he and **Grice** had been friends for years, that Ward had no reason to fear **Grice** on the day the attack occurred, and that the two had not argued that day. The jury could therefore conclude that **Grice's** attack on Ward was simply unprovoked. This would certainly indicate that Ward was the victim of a "cold and deliberate attack." FN4 ( *Ferrell,* at p. 835.)

FN4. **Grice** also argues that his acquittal on the charges of attempted murder and attempted voluntary manslaughter demonstrates that he lacked the specific intent to maim Ward. But section 205 expressly provides that "[f]or purposes of this section, it is not necessary to prove an intent to kill." Thus, his acquittal on those counts does not establish that he lacked the specific intent necessary to sustain a conviction for aggravated mayhem.

We therefore reject **Grice's** contention that there was insufficient evidence of the specific intent required to convict him of the crime of aggravated mayhem.

II. *The Trial Court Had No Duty to Instruct the Jury Sua Sponte on Imperfect Self-Defense on the Charges of Simple and Aggravated Mayhem*

Defense counsel requested, and the jury was given, an instruction on self-defense as to all crimes. The superior court also instructed the jury on imperfect self-defense as it relates to the crime of attempted murder. Defense counsel did not request that an imperfect self-defense instruction be given in relation to either aggravated or simple mayhem. Having failed to request such an instruction below, **Grice** nevertheless argues on appeal that the superior court should have given the imperfect self-defense instruction in relation to the charges of aggravated mayhem and simple mayhem. We disagree.

\*6 In criminal cases, the trial court is required to instruct on " ' "the general principles of law relevant to the issues raised by the evidence" ' " even in the absence of a request. (*People v. Edwards* (1985) 39 Cal.3d 107, 117, quoting *People v. St. Martin* (1970) 1 Cal.3d 524, 531.) Such "general principles" are " 'those principles of law *commonly* or closely and openly connected with the facts of the case before the court.' [Citations.]" (*People v. Flannel* (1979) 25 Cal.3d 668, 681.) But the trial court "has no duty to ... instruct on doctrines of law that have not been established by authority." ( *People v. Michaels* (2002) 28 Cal.4th 486, 529;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                 Page 6
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

accord, *People v. Bacigalupo* (1991) 1 Cal.4th 103, 126, judg. vacated on other grounds in *Bacigalupo v. California* (1992) 506 U.S. 802.) "[A] legal concept that has been referred to only infrequently, and then with 'inadequate elucidation,' cannot be considered a general principle of law such that a trial court must include it within jury instructions in the absence of a request. [Citation.]" (*People v. Bacigalupo,* at p. 126, fn. omitted.) We must therefore determine whether the application of imperfect self-defense to the crimes of simple and aggravated mayhem constitutes the type of general principle of law that gives rise to a sua sponte duty to instruct.

The sole authority cited by **Grice** in support of his argument is *People v. McKelvy* (1987) 194 Cal.App.3d 694. In *McKelvy,* Presiding Justice Kline, writing only for himself, concluded that imperfect self-defense may be a defense to *simple* mayhem. (*Id*. at pp. 701-707 (lead opn. of Kline, P.J.).) Neither of his colleagues concurred in that holding, however. (See *id.* at pp. 707-708 (conc. opn. of Smith, J., joined by Rouse, J.) [concurring only in the judgment].) While relying on *McKelvy,* **Grice** concedes, as he must, that subsequent cases have expressly disagreed with the lead opinion in that case. (See *People v. Hayes* (2004) 120 Cal.App.4th 796, 801-805; *People v. Sekona* (1994) 27 Cal.App .4th 443, 448-457.)

**Grice** devotes a lengthy portion of his brief to arguing that Presiding Justice Kline's opinion in *McKelvy* is correct and to pointing out what he believes to be the errors in the analysis in *Hayes* and *Sekona*. But we need not venture an opinion as to which line of analysis is correct. For our purposes, the merits of the imperfect self-defense issue are largely beside the point. The narrow question that we must decide is whether a legal rule adopted by only a single justice of an intermediate appellate court constitutes the type of general principle of law that will give rise to a sua sponte duty to instruct on the part of the trial court. We have no trouble concluding that it does not.

The California Supreme Court has indicated that " evaluation and acceptance of a legal rule in one intermediate appellate decision" is insufficient to transform that rule into a "general principle of law." (*People v. Bacigalupo, supra,* 1 Cal.4th at pp. 126-127, fn. 4.) If acceptance of a legal rule by a single intermediate appellate court is insufficient to transform it into a general principle of law giving rise to a sua sponte duty to instruct, then it should be obvious that the acceptance of the rule by a single appellate justice is likewise insufficient. Thus, "[e]ven if the *McKelvy* lead opinion correctly stated the law concerning the effect of an actual but unreasonable right to defend in a mayhem case, it would be unlikely a sua sponte duty to instruct would exist ." (*People v. Sekona, supra,* 27 Cal.App.4th at p. 451.)

*7 This conclusion is confirmed by *Flannel,* the case in which our Supreme Court explained that an unreasonable belief in self-defense negates malice aforethought. (*People v. Flannel, supra,* 25 Cal.3d at pp. 674-680.) Although the Supreme Court noted that "*it has been legal doctrine,* even though infrequently applied in the past, that a genuine but unreasonably held belief negates the mental state of malice aforethought that is necessary for a murder conviction[,]" it nevertheless held that the trial court had not erred in failing to instruct on the issue sua sponte. (*Id.* at p. 682, italics added.) The legal rule assumed the character of a general principle of law only "with the increased judicial cognizance which ... follow[ed]" the Supreme Court's exposition of the rule in *Flannel.* (*Ibid.*) If no sua sponte duty to instruct existed in a case such as *Flannel,* which involved an existing, although infrequently applied, legal rule, it is apparent that no such duty can exist in a case such as the one before us, where the legal rule at issue has yet to be accepted by a single appellate court. (See *People v. Bacigalupo, supra,* 1 Cal.4th at pp. 126-127 & fn. 4; *People v. Sekona, supra,* 27 Cal.App.4th at p. 451.)

We therefore hold that the superior court had no sua sponte duty to instruct the jury on the issue of imperfect self defense.

### III. *Grice Has Failed to Demonstrate That His Trial Counsel Was Ineffective*

**Grice** next argues that if the superior court had no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                                                Page 7
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

sua sponte duty to instruct on imperfect self-defense in relation to the mayhem charges, then his trial counsel was ineffective because he failed to request an imperfect self-defense instruction. We conclude that **Grice's** ineffective assistance of counsel claim is unsupported by the record.

To make out a claim of ineffective assistance of counsel, a defendant must first show that counsel's performance was deficient. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687.) That is, defendant must show that counsel's performance " ' fell below an objective standard of reasonableness ... under prevailing professional norms.' " (*Ledesma,* at p. 216, quoting *Strickland,* at p. 688.) In determining whether trial counsel's performance was deficient, we exercise what the California Supreme Court has called "deferential scrutiny." ( *Ledesma,* at p. 216.) " 'In some cases ... the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged.' [Citation.]" ( *Id.* at p. 218.) In such cases, unless counsel was asked for an explanation and failed to provide one, or unless there could be no satisfactory explanation for the choice made, the claim on appeal must be rejected. (E.g., *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266, citing cases.)

In this case, we conclude that **Grice** cannot show that trial counsel's performance was deficient. On the issue of deficiency, **Grice** points to nothing in the record that explains trial counsel's failure to request the imperfect self-defense instruction. As a consequence, his ineffective assistance of counsel claim "fails in the context of this direct appeal because the record does not reveal whether counsel had a plausible tactical reason for not submitting such an instruction." (*People v. Carter* (2003) 30 Cal.4th 1166, 1225-1226.) In cases in which the record is lacking an explanation for counsel's chosen course of action, the California Supreme Court has stated that a claim of ineffective assistance of counsel is "more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.) Such an approach " 'promote[s] judicial economy in direct appeals where the record contains no explanation....' [Citation.]" (*People v. Wilson*

(1992) 3 Cal.4th 926, 936.)

*8 Nor can we say on this record that " 'there could be no satisfactory explanation' " for the choice made by defense counsel. (*People v. Mendoza Tello, supra,* 15 Cal.4th at p. 266.) At the time of trial, *Sekona* was the only binding authority on the applicability of the doctrine of imperfect self-defense to the crime of simple mayhem, and the *Sekona* court had expressly rejected Presiding Justice Kline's opinion in *McKelvy,* the sole authority upon which **Grice** relies. (See *People v. Sekona, supra,* 27 Cal.App.4th at p. 457.) Defense counsel might well have concluded that, in light of *Sekona,* the trial court would necessarily reject any request for an imperfect self-defense instruction with respect to aggravated and simple mayhem. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Decisions of *every division* of the District Courts of Appeal are binding upon all the justice and municipal courts and upon *all the superior courts of this state ....*" (Italics added.) ].)

IV. *The Trial Court Did Not Abuse Its Discretion in Limiting the Cross-Examination of Witness Marie Casteel*

At trial, Marie Casteel was called as a witness for the People. **Grice** raises a host of claims relating to the trial court's limitation of the cross-examination of Casteel. The bulk of the claims concern the trial court's exclusion of evidence of certain of her prior arrests and convictions to impeach her. In addition, **Grice** also contends that the trial court improperly limited his questioning of Casteel with respect to her knowledge of **Grice's** custodial status. We address these issues in turn.

A. *The Prior Arrests and Convictions*

Prior to trial, the People had sought to exclude any mention to the jury of any of Casteel's arrests and misdemeanor convictions. The trial court prohibited the defense's use of a number of the arrests and convictions, but it permitted **Grice** to impeach Casteel with the conduct underlying (1) a 1987

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                                           Page 8
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

conviction for violation of section 485 (theft) and (2) a 1996 conviction for violation of section 273.5 (spousal abuse).[FN5]

> FN5. It appears that, in the end, **Grice's** trial counsel chose not to impeach Casteel with the conduct underlying these convictions. At trial, he neither asked Casteel about the conduct nor offered evidence concerning it.

**Grice** argues that it was error for the trial court to have precluded defense counsel from impeaching Casteel with a 1983 arrest for violation of Vehicle Code section 10851 (vehicle theft) and with 1985 and 1988 misdemeanor convictions for violation of the same statute. In ruling on this issue, the trial court stated that "[h]er arrest and her conviction, misdemeanors, both for joy riding, are excluded. I find them not to be crimes of moral turpitude. They are not relevant. They are more prejudicial than probative." **Grice** contends that the trial court erroneously concluded that these offenses did not involve moral turpitude and that this error "undermined entirely its Evidence Code section[s] 350 and 352 findings, since each turns on the erroneous finding of no relevance."

We disagree. It is true that the trial court's statement was erroneous, because a violation of Vehicle Code section 10851 does involve moral turpitude. (*People v. Lang* (1989) 49 Cal.3d 991, 1010-1011, citing *People v. Rodriguez* (1986) 177 Cal.App.3d 174, 178.) But the trial court also rested its decision on its finding that evidence of these offenses would be more prejudicial than probative, and **Grice** does not take issue with that conclusion. The admissibility of past misconduct for impeachment purposes is limited in the first instance by the requirement that it involve moral turpitude. (*People v. Wheeler* (1992) 4 Cal.4th 284, 296, superseded by statute on other grounds as stated in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1460.) This relevance requirement is separate and distinct from the requirement that the impeachment evidence be more probative than prejudicial. "Beyond [the relevance requirement], the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*Wheeler*, at p. 296.) It does not appear that the trial court abused its discretion under Evidence Code section 352 in excluding evidence of Casteel's arrest and convictions for violation of Vehicle Code section 10851.

*9 **Grice** also contends that the trial court erred in excluding the conduct underlying Casteel's 1994 and 1995 arrests for simple battery, as well as her 2002 arrest for violation of Health and Safety Code section 11352. In each instance, the trial court concluded that because each of these matters involved arrests only, rather than convictions, impeachment on these grounds would be misleading and confusing to the jury and more prejudicial than probative. We perceive no abuse of the trial court's discretion. When evidence other than felony convictions is offered for impeachment, the trial court is confronted with "problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present." (*People v. Wheeler, supra,* 4 Cal.4th at p. 296.) It is therefore particularly appropriate that the trial court weigh "whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id.* at pp. 296-297.) This is precisely what the trial court appears to have done here, and **Grice** offers no convincing argument that it abused its discretion.

B. *Knowledge of **Grice's** Custodial Status*

Casteel testified on direct examination that she had not told anyone of **Grice's** admission that he had thrown gasoline on Ward and lit it with a match because **Grice** was "out and about." She then also testified that she had told Levin about **Grice's** admission a year prior to the trial. **Grice** complains that the trial court refused to permit him to elicit testimony from Levin that **Grice** had been in custody from September 29, 2002, and was still in custody. He argues that under Evidence Code section 780, subdivision (i), he should have been permitted to prove that **Grice** was in custody,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                                                           Page 9
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

presumably to undermine the credibility of Casteel's implicit assertion that she had told no one about **Grice's** admission because he was at liberty and might harm her.

In reviewing this claim, we must view it in the context of "the relevant issue in the case" before we can determine whether the impeachment evidence was properly excluded. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 10.) Here, **Grice** seems to have hoped to cast doubt on Casteel's explanation for not speaking out by showing that **Grice** was, in fact, in custody and thus Casteel had no reason to fear him. But the relevant issue was not whether **Grice** was actually in custody. Rather, the issue was Casteel's *belief* that **Grice** was at liberty and thus in a position to harm her. Evidence that **Grice** was in custody would not directly meet Casteel's testimony unless there was also evidence showing Casteel's awareness of this fact. (Cf. *Id.*, at p. 10 [witness' testimony that she had not given defendant permission to use roof of building did not address issue of whether defendant was actually on roof at time of murder].)

We agree with the trial court that this line of questioning was properly prohibited because there was no testimony "that [Casteel] had any knowledge or thoughts about [**Grice's**] living situation, whether he was still at the hotel, at another residence, or in custody. [¶] Therefore, it is reasonable to presume that she may have assumed that he was still out, not in custody, and that he might still present a threat to her." **Grice** points to no testimony or other evidence in the record (and we have found none) that shows that Casteel was aware that **Grice** was in custody. **Grice** speculates that "the 'grapevine' in the Stanford Hotel would surely have informed her to the contrary." But he offers nothing to substantiate this speculation, and his conjecture furnishes no basis for holding that the trial court abused its discretion.

*10 We conclude that the trial court did not err either in limiting cross-examination regarding Casteel's prior arrests and convictions or in excluding evidence that **Grice** was in custody.[FN6]

FN6. We have found no error in the trial court's application of the rules of evidence. It follows that **Grice's** constitutional challenges based on these rulings lacks merit. (*People v. Rodriguez, supra,* 20 Cal.4th at p. 10, fn. 2.) The application of ordinary rules of evidence generally does not impermissibly infringe on an accused's right to present a defense. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)

Disposition

The judgment is affirmed.

We concur. STEVENS, Acting P.J., and GEMELLO , J.
Cal.App. 1 Dist.,2005.
People v. Grice
Not Reported in Cal.Rptr.3d, 2005 WL 3446571 (Cal.App. 1 Dist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.